**Gary WALLACE, Plaintiff,**

v.

**SCHOOL BOARD OF ORANGE COUNTY, FLORIDA,**
**Defendant.**

**No. 97–1064–CIV–ORL–18C.**

United States District Court,
M.D. Florida,
Orlando Division.

Dec. 15, 1998.

---

Howard S. Marks, Graham, Clark, Jones, Builder, Pratt & Marks, Winter Park, FL, for Plaintiff.

M. Susan Sacco, James G. Brown, Brown & Green, P.A., Orlando, FL, for Defendants.

## ORDER

G. KENDALL SHARP, District Judge.

Plaintiff Gary Wallace ("Wallace") brings this instant action against defendant School Board of Orange County (the "School Board") alleging that he was terminated in retaliation for making statements on behalf of a co-worker's race discrimination charge. Plaintiff claims that his termination violates 42 U.S.C. § 1983 (" § 1983"); Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e (West 1997) ("Title VII"); the Florida Civil Rights Act of 1992 ("FCRA"); and Sections 112.3187 and 448.102, Florida

Statutes. Plaintiff also alleges that his termination breaches a contract between the School Board and the Orange Educational Support Personnel Association ("OESPA") of which the plaintiff had been a member of the bargaining unit. In his Amended Complaint, the plaintiff seeks compensatory damages, back pay, costs and attorneys' fees, and an injunction. The case is presently before the court on the defendant's motion for summary judgment to which the plaintiff has responded in opposition. Additionally, the defendant has filed a motion to strike portions of plaintiff's memorandum of law in opposition to defendant's motion for summary judgment. Following a review of the case file and relevant law, the court finds that the defendant's motion for summary judgment should be granted and its motion to strike should be denied.

## I. Factual Background

Plaintiff was employed by the School Board from January 26, 1988 until February 13, 1996 as a mechanic at the School Board's automotive/bus repair facility known as Hanging Moss. On June 28, 1994, plaintiff's co-worker, George Benjamin ("Benjamin"), made a charge of race discrimination to the School Board. Pursuant to Benjamin's allegations of a racially hostile working environment and racial discrimination, Adele Steinhauser ("Steinhauser"), an EEO specialist for the School Board, was sent to Hanging Moss to investigate Benjamin's discrimination charge. Steinhauser's investigation included interviewing approximately 40 employees, one of whom was the plaintiff. In addition to the oral statements he gave in his interview with Steinhauser, plaintiff alleges that shortly before he was terminated, he gave written statements to Benjamin and Benjamin's attorney in support of Benjamin's claims.

In February of 1995 a bus driver employed by the School Board drove across a train track in an apparent attempt to beat an oncoming train to the crossing. The train hit the rear of the bus, injuring several students. This accident made national news, in part because the bus driver had a questionable driving record. As a result of the accident, the School Board instituted the Safe Driver Plan ("the Plan").

The Plan, which went into effect on August 1, 1995, involves the monitoring of driving records of operators of School Board-owned or leased vehicles, which includes mechanics. The Plan covers citations received in private vehicles on personal time. Under the Plan, points are assessed based on the type of infraction and the failure to report an infraction. The School Board checks the State's records concerning employees that are covered by the Plan at the end of the summer school session, in late December, and at the end of the regular school year to determine whether there have been any unreported infractions. The Plan was revised on October 1, 1996, after plaintiffs termination. The School Board and the OESPA entered into a Memorandum of Understanding relative to the revised Plan on May 1, 1997.

On August 7, 1995, plaintiff received a copy of the Plan and acknowledged by signature that he understood that it applied to his private as well as School Board-owned/leased vehicles. In the present suit, the plaintiff does not challenge the legality of the Plan or its application to him and his private vehicle. Three weeks after signing a copy of the Plan, plaintiff received a citation for driving his private vehicle 64 mph in a 45 mph zone, which he did not report as required under the Plan. The citation and plaintiff's failure to report the citation resulted in an assessment of points sufficient to require his termination under the Plan. Plaintiff's termination was recommended to the School Board on January 17, 1996 and the School Board approved the termination on February 13, 1996. On or about January 24, 1996, plaintiff filed a charge of discrimination with the EEOC alleging retaliatory termination. After receiving his right-to-sue letter from the EEOC, this present suit followed.

## II. Legal Discussion

### A. Summary Judgment Standards

Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505.

The moving party bears the burden of proving that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied the burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party may rely solely on his pleadings to satisfy this burden. *See Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548; Fed.R.Civ.P. 56(c).

"[A]ll that is required [to proceed to trial] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (quoting *First Nat'l. Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Summary judgment is mandated, however, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. Defendant's Motion to Strike Portions of Plaintiff's Opposition to Defendant's Motion for Summary Judgment

On November 5, 1998, the defendant filed a motion to strike portions of plaintiffs response to defendant's motion for summary judgment to which the plaintiff has responded in opposition. In its motion, the defendant argues that the plaintiffs response "contains statements that are either mischaracterizations of the evidence, not supported by record citations, or are inadmissible hearsay." (Doc. 61, Def's Mtn. at 1). The court, however, can make its own determination as to whether there is a genuine issue for trial after evaluating all the evidence in the record. Therefore, the defendant's motion to strike is denied.

### C. Defendant's Motion for Summary Judgment

In Counts I and II, the plaintiff alleges violation of his rights under the First Amendment as enforced by § 1983, and Title VII, respectively. Counts III, IV, V, and VI are state law claims for violation of the FCRA, Sections 112.3187 and 448.102 of the Florida Statutes, and for breach of contract. The court will address each of the plaintiffs claims in its respective order.

#### 1) Count I—42 U.S.C. § 1983

 Plaintiff claims that the defendant violated his right to free speech by terminating him for giving statements in support of Benjamin's race discrimination charge. It is axiomatic that a state employer may not "demote or discharge a public employee in retaliation for protected

speech." *Morgan v. Ford,* 6 F.3d 750, 753–54 (11th Cir.1993) (citations omitted). The Eleventh Circuit employs a four-part test to determine whether an employer's actions constitute retaliation for protected speech in violation of the First Amendment. *See Bryson v. City of Waycross,* 888 F.2d 1562, 1565–66 (11th Cir.1989). The Bryson test examines: "(1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct." *Id.* Defendant argues that it is entitled to summary judgment on Count I because the plaintiff's speech was not of public concern. Additionally, the defendant claims that plaintiffs speech was not a substantial, motivating factor in the School Board's decision to terminate the plaintiffs employment.

Under the first prong of the Bryson test, the court must determine, as a matter of law, whether Wallace's speech "may be 'fairly characterized as constituting speech on a matter of public concern.'" *Id.* at 1565 (quoting *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987)). For an employee's speech to constitute a matter of public concern, "it must relate to a matter of political, social, or other concern to the community." *Watkins v. Bowden,* 105 F.3d 1344, 1353 (11th Cir.1997). In making this determination, the court considers "the content, form, and context of the employee's statements, the employee's attempts to make the concerns public, and the employee's motivation in speaking." *Id.*

Wallace's oral statements to Steinhauser and his written statements to Benjamin and Benjamin's attorney do not constitute speech on a matter of public concern. Wallace's statements were given privately and he made no attempt to "draw the public at large or its concerns into the picture." *Id.* The statements were not made in a public forum and they did not involve a breach of the public trust or political matters. *Cf. Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1540 (11th Cir.1994) (finding plaintiffs testimony in federal district court in support of another individual's discrimination claim to constitute speech on a matter of public concern); *Beckwith v. City of Daytona Beach Shores, Florida,* 58 F.3d 1554, 1564 (11th Cir.1995) (finding that speech on public issues such as the provision of basic fire and rescue services is of public concern); *Arenal v. City of Punta Gorda, Florida,* 932 F.Supp. 1406, 1412 (M.D.Fla.1996) (finding that plaintiff's testimony relating to a fire department investigation involved a breach of the public trust and therefore was a matter of public concern).

Although Wallace's speech in support of Benjamin's race discrimination charge may have contained a public concern aspect, rarely will an employee's speech be entirely public or entirely private. *See Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir.1993). After examining the statements Wallace provided to Benjamin and his attorney, the court finds that they were made primarily in Wallace's role as an employee rather than his "role as a citizen." *Kurtz v. Vickrey,* 855 F.2d 723, 727 (11th Cir.1988). Furthermore, Wallace's statements to Steinhauser were made privately and were initiated by the School Board.

Plaintiff cites several cases in support of his argument that his speech involved a matter of public concern. Those cases, however, are distinguishable from the case at hand. Although the plaintiffs speech in *Tindal* supported the discrimination claims of other individuals, it was made in a public forum (a federal district court proceeding). *See Tindal,* 32 F.3d at 1540. Wallace's statements to Steinhauser, Benjamin, and Benjamin's attorney were made privately. Plaintiff claims that he submit-

ted affidavits in support of Benjamin's claims (Doc. 49, Pl's Resp. at 15) but none of the statements at issue. are affidavits. The written statements that Wallace gave to Benjamin and his attorney are informal in nature. They are handwritten, one is undated and none of the statements appear to have been given under oath.

Plaintiff also refers to *Arenal v. City of Punta Gorda,* 932 F.Supp. 1406 (M.D.Fla. 1996) to support his argument that his speech was on a matter of public concern. In *Arenal,* the plaintiffs speech concerned an investigation into the City's fire and police departments and included testimony before a Grand Jury. The court concluded that plaintiffs speech " '[brought] to light actual or potential wrongdoing or breach of public trust.' " *Arenal,* 932 F.Supp. at 1412 (quoting *Connick v. Myers,* 461 U.S. 138, 148, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983)). Wallace, however, did not testify in a court proceeding and his statements did not involve a breach of public trust.

In *Martinez v. City of Opa–Locka, Florida,* 971 F.2d 708 (11th Cir.1992), the third case Wallace cites, the court held that the plaintiffs speech addressed a matter of public concern because his statements "provided information concerning the expenditure of public funds in violation of the City's Code of Ordinances." *Id.* at 712. Unlike the plaintiff's speech in *Martinez,* Wallace's statements did not involve " 'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government." *Id.* (quoting *Allen v. Scribner,* 812 F.2d 426, 431 (9th Cir.1987)). Therefore, *Martinez* is distinguishable and does not support plaintiff's argument that his speech is constitutionally protected under the First Amendment. Consequently, because the plaintiff cannot meet the first prong of the Bryson test, summary judgment in favor of the defendant is appropriate on Count I.

■ Assuming arguendo that plaintiffs speech could meet the first prong of the Bryson test, summary judgment would still be granted because Wallace has not made a showing sufficient to permit a reasonable jury to find that his protected speech was a substantial or motivating factor in the School Board's decision to terminate his employment. There is insufficient evidence in the record to permit an inference that the School Board's decision to terminate Wallace was in any way retaliatory. The record shows that Wallace's unreported citation was discovered on December 27, 1995 and a recommendation was made by Joseph Pemoulie ("Pemoulie"), the Administrator for Employee Services, that Wallace be terminated "based on the point assessment ... within the Safe Driver Plan since August 1, 1995." (Doc.34, Barnes Aff., ¶ 11). On January 9, 1996, Wallace attended a meeting with his supervisor, Steve Huckeba ("Huckeba"), and Fred Barnes ("Barnes"), Senior Administrator of Transportation Services. In his affidavit, Barnes states that based upon Wallace's accumulation of points, he recommended that Wallace be terminated under the Safe Driver Plan. *See id.* at ¶ 13. On January 17, 1996, Barnes notified Wallace that his termination was being recommended to the School Board.

Wallace has not presented evidence that would create a question of fact as to whether the School Board or anyone recommending Wallace's termination had knowledge of the statements he gave in support of Benjamin. There is no evidence that Barnes, Huckeba or Pemoulie were aware of the statements given to Steinhauser or the written statements given to Benjamin and his attorney. The only evidence presented by the plaintiff is a letter written on February 6, 1996 to Katie Adams ("Adams"), a member of the School Board, from Reginald Hicks ("Hicks"), Benjamin's attorney. In the letter, Hicks states that Wallace gave a statement to Steinhauser in support of Benjamin's allegations and then was terminated for allegedly violating the Safe Driver Plan. (Doc. 50, Def.App., Ex. G). This letter, however, was written after Wallace's termination was recommended to the

School Board. Furthermore, Hicks states that Wallace had already been terminated at the time the letter was written. *See id.* Therefore, there is no evidence that the plaintiff's speech was a substantial factor in Ms. Adams' decision or the rest of the School Board's decision to terminate the plaintiff.

Plaintiff also claims that he gave a written statement to Benjamin in December of 1995 which was then transmitted to David Wofford ("Wofford"), a senior manager at the Hanging Moss facility. However, the statement is undated and Benjamin stated in his deposition that Wallace gave him the statement in 1994. (Doc. 53, Benjamin Depo. at 30). Even if the statement was given to Wofford in December 1995, there is no evidence that Wofford was involved in the decision to terminate the plaintiff or that the School Board had any knowledge of the statement when it approved his termination.

In his opposition to summary judgment, plaintiff states that the "School Board had knowledge that the individuals who played a substantial part in recommending the termination of Plaintiff Wallace were specifically recommending termination because of Plaintiff Wallace's speech." (Doc. 49, Def's Resp. at 18). The record, however, contains no evidence to support this statement. Thus, the plaintiff has not produced evidence that a retaliatory motive was a substantial factor in the School Board's decision to terminate his employment and, therefore, summary judgment is appropriate on Count I.

### 2) Count II—Title VII

■ In Count II, the plaintiff alleges that the School Board retaliated against him in violation of Title VII. To establish a prima facie case for retaliation under Title VII, a plaintiff must show (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Raney v. Vinson,* 120 F.3d 1192, 1196 (11th Cir.1997) (citations omitted). Once the prima facie case has been established, the burden shifts to the defen-

dant to come forward with legitimate reasons for the adverse employment action. *See id.* If the defendant proffers legitimate reasons, the burden shifts back to the plaintiff to show that the defendant's reasons are pretextual. *See id.* The School Board argues that summary judgment should be granted as to Count II because the plaintiff cannot establish the third prong of the prima facie case; the causal link. Furthermore, even if the plaintiff could show a causal link, the defendant argues that plaintiff cannot show that the School Board's legitimate non-retaliatory reason is pretextual.

■ To establish a causal link, the "plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action." *Id.* at 1197. Defendant's knowledge must be shown with more evidence than curious timing and speculative theories. *See id.* Plaintiff claims that he was terminated because of an oral statement he gave to Steinhauser, a written statement he gave to Benjamin, and written statements he gave to Benjamin's attorney. However, plaintiff fails to establish that the School Board or the any of the people who recommended his termination had knowledge of any of these statements.

■ First, there is no evidence that anyone involved in Wallace's termination was aware of his statements to Steinhauser until after he was notified that his employment was being recommended for termination. During her investigation of Benjamin's complaint, Steinhauser interviewed approximately 40 employees, identifying them only by a number, job title, and length of employment. (Doc. 32, Steinhauser Aff., ¶ 5). The only person other than Steinhauser who knew which employee provided any particular statement was LeighAnn Blackmore, then-EEO Senior Manager. In her affidavit, Ms. Blackmore states that she "never disclosed to any of Gary Wallace's supervisors that he made

any statements in Benjamin's behalf." (Doc. 31, Blackmore Aff., ¶ 4). Furthermore, Wallace was interviewed by Steinhauser in June of 1994; a year and a half before his termination was recommended to the School Board. Plaintiff argues that the letter written by Hicks to Adams, in which Hicks mentions that Wallace had given a statement to Steinhauser in support of Benjamin, shows that the School Board had knowledge of his protected expression. This letter, however, was written after the recommendation for termination was sent to the School Board and after the plaintiff had filed a claim of retaliatory termination with the EEOC. Plaintiff also speculates that Huckeba must have known of his statements to Steinhauser because shortly after his interview he was overloaded with work both inside and outside his area of responsibility. Speculation, however, does not establish that the defendant was actually aware of Wallace's statements to Steinhauser.

The second alleged protected activity is the four written statements that Wallace gave to Hicks, Benjamin's attorney. However, there is no evidence that the School Board was aware of the statements when the plaintiff's termination was recommended. Plaintiff was notified that his termination was being recommended to the School Board on January 17, 1996 and the statements given to Hicks are dated "1–25–96." Therefore, those statements could not have played a factor in the recommendation to terminate Wallace's employment. Plaintiff also has not provided evidence to show that the School Board had knowledge of the statements when it approved the recommendation for plaintiff's discharge on February 13, 1996.

Plaintiff also asserts that the School Board was aware of a written statement he provided to Benjamin, who then gave it to Wofford. However, as discussed above, there is no evidence that the School Board ever became aware of this statement or that Wofford was involved in the decision to recommend plaintiff's discharge. Wofford states in his deposition that he did not think he was involved in the meetings that led to Wallace's termination. (Wofford Depo. at 11). Furthermore, he states that he was probably kept apprised of Wallace's situation but he did not think he was directly involved. See id. Therefore, plaintiff cannot establish a prima facie case because he is unable to show a causal link between his protected expression and his termination.

Even if plaintiff could show that the School Board had knowledge of his statements in support of Benjamin, the defendant argues that it is nonetheless entitled to summary judgment because it has articulated a legitimate non-discriminatory reason for its actions which the plaintiff cannot show is pretextual. On December 27, 1995, as a result of the periodic state record review, Barnes learned that Wallace had been issued a citation which he had failed to report. Pursuant to the Safe Driver Plan, Wallace was assessed five points for "Speeding— more than 15 miles per hour over the legal limit" and six points for "Failure to report an accident or any violation . . . no later than 72 hours if in private vehicle." (Doc. Barnes Aff., Ex. 1). The Plan provides that if a covered employee accumulates eleven points within a twelve month period, the action to be taken is "termination in position or 8 points and loss of use of district-owned/leased vehicles with written directives prohibiting the operation of any district-owned/leased vehicle." Id. Because the plaintiff's position required that he be able to drive School Board-owned or leased vehicles, termination was the option chosen by the School Board. Therefore, the defendant has articulated a legitimate non-discriminatory reason for the termination and the burden shifts back to the plaintiff to show that the reason is actually a pretext for retaliation.

On a motion for summary judgment, where the employer has proffered a legitimate reason for the adverse employment action, "[t]he district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the

defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.' " *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997) (quoting *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir.1994)). The plaintiff must demonstrate " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.' " *Id.* (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3rd Cir.1996)).

The plaintiff does not challenge the legality of the Plan or its application to him and his private vehicle. Instead, he argues that the defendant's reason is pretextual because there is a clear time link between the protected expression and the onset of retaliatory employment action. However, as the plaintiff states in his response to summary judgment, temporal proximity is not dispositive in proving pretext. (Doc. 49, Pl's Resp. at 9). Furthermore, the plaintiff's time link argument is not persuasive because the defendant became aware of plaintiff's failure to report his citation on December 27, 1995 and a recommendation that his employment be terminated was made several weeks later.

Plaintiff also argues that he was treated less favorably than other similarly situated employees under the Plan. His argument fails, however, because the evidence does not demonstrate a significant disparity in the treatment of workers under the Plan. Employees Carlos Santiago, Antoinette Exna, Walter McNeal, Jose Vega–Ortiz, and Yvonne Woods were all recommended for termination based on their infractions under the Plan. (Doc. 50, Pl's App.) Specifically, Carlos Santiago and Jose Vega–Ortiz were recommended for termination because they had accumulated eleven points under the Plan; the same number of points as the plaintiff. Therefore, there is insufficient evidence of disparate treatment to raise a question of material fact as

to whether the plaintiff's termination under the Plan was a pretext for retaliation. Consequently, summary judgment in favor of the defendant on Count II is warranted.

### 3) Count III—FCRA

In Count III of his Amended Complaint, the plaintiff claims that the School Board violated the FCRA by terminating him in retaliation for the statements he gave in support of Benjamin's race discrimination charge. "The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida Act was patterned after Title VII." *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1387 (11th Cir.1998) (citations omitted). Therefore, because summary judgment is warranted on plaintiff's Title VII retaliation claim, summary judgment is also granted on plaintiff's FCRA claim.

### 4) Count IV—Florida Statute § 112.3187

Plaintiff claims that his termination violates Florida's Whistle-blower Act, Florida Statute § 112.3187. The Whistle-blower Act prohibits state employers and independent contractors from taking retaliatory action against employees who "disclose information on their own initiative in a written and signed complaint; who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity; [or] refuse to participate in any adverse action prohibited by this section." Fla.Stat. § 112.3187(7). The statute also provides that "[i]t shall be an affirmative defense to any action brought pursuant to this section that the adverse action was predicated upon grounds other than, and would have been taken absent, the employee's or person's exercise of rights protected by this section." *Id.* at § 112.3187(10).

The School Board argues that Wallace's employment was terminated based on his accumulation of points under the Plan and would have occurred absent

his statements in support of Benjamin. The defendant has proved the factual existence of the defense and its legal sufficiency. Consequently, defendant's motion for summary judgment is granted as to Count IV.

### 5) Count V—Florida Statute § 448.102

■ Plaintiff also claims that his termination violates Florida Statute § 448.102. This section is the private sector Whistleblower's Act which became effective June 7, 1991. See Arrow Air, Inc. v. Walsh, 645 So.2d 422, 423 (Fla.1994) (stating that the purpose of § 448.102 is to "protect private employees who report or refuse to assist employers who violate laws enacted to protect the public."); Resley v. Ritz–Carlton Hotel, Co., 989 F.Supp. 1442, 1445 (M.D.Fla.1997). Under this section an employer is defined as "any private individual, firm, partnership, institution, corporation, or association that employs ten or more persons." Fla.Stat. § 448.101(3). The plaintiff does not dispute that the School Board is a governmental entity. Therefore, § 448.102 does not apply to the defendant and summary judgment is warranted.

### 6) Count VI—Breach of Contract

In Count VI of his Amended Complaint, the plaintiff alleges that his termination breaches a Memorandum of Understanding ("MOU") between the School Board and the OESPA. Plaintiff claims that he is covered by the MOU because he was a member of the bargaining unit represented by the OESPA at the time of his termination. (Doc. 42, Am.Compl. at ¶ 60).

On May 1, 1997, the School Board and the OESPA executed an MOU which adjusted the point system under the Plan to reflect the point system used by the Florida Division of Motor Vehicles. The MOU provides that:

> If the disciplinary action under the revised point system is less than that under the earlier Plan, adjustments shall be made to the extent feasible. This shall include reinstatement of back pay for employees who were suspended

without pay beyond what the current Plan requires.

(Doc. 50, Pl's App., Ex. N). Under the revised point system the plaintiff would have received eight points which merited only a three day suspension. In order to correct the different treatment between the two plans, the plaintiff argues that the defendant should have contacted him and offered him his job back Because he was never contacted, the plaintiff claims that the defendant breached the MOU.

■ The plaintiff's claim for breach of contract fails because the plaintiff was not a party to the MOU nor an intended third party beneficiary of the MOU. See Caretta v. Cheoy Lee Shipyards, Ltd., 647 So.2d 1028, 1030–31 (Fla. 4th DCA 1994). The MOU is an agreement between the School Board and the OESPA. Plaintiff claims he is covered by the MOU because he was a member of the bargaining unit represented by the OESPA at the time of his termination. The MOU, however, was signed on May 1, 1997, over a year after the plaintiff's termination. (Doc. 50, Pl's App., Ex. N). The OESPA represents all full-time and part-time classified personnel employed by the School Board. (Doc. 50, Pl's App., Ex. M). The October 10, 1995 contract between the School Board and the OESPA does not include former School Board employees in the OESPA's bargaining unit. Furthermore, the language in the MOU does not require the School Board to reinstate former employees who were terminated under the earlier Plan. Therefore, because the plaintiff was not represented by the OESPA when the MOU was signed and the MOU does not provide a remedy to former School Board employees, summary judgment in favor of the defendant is warranted.

### III. Conclusion

For all of the reasons set forth above, the court **GRANTS** the defendant's motions for summary judgment (Docs. 27 and 63) as to all Counts in the Amended Complaint and **DENIES** defendant's motion to

strike portions of plaintiff's memorandum of law in opposition to defendant's motion for summary judgment (Doc. 61). Accordingly, the court directs the clerk of court to enter the appropriate judgment and to close the case.